IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SEVERALLY SUBSCRIBING TO POLICY NO. MPL-0000343-01, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 20 C 2660 |
| | ) | Judge Ronald A. Guzmán |
| NICK KARRIS JR.; HOLLY SOFIA KARRIS, individually and as mother and next friend of ZOE KARRIS KOCH, a minor, and of YANNICK KARRIS KOCH, a minor, and as representative of the August 7, 1997 Nicholas A. Karris Declaration of Trust; and ALEXIS KOCH, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons explained below, plaintiff's motion for judgment on the pleadings is granted, and defendant Nick Karris Jr.'s amended cross-motion for judgment on the pleadings is denied.

### BACKGROUND

This is a declaratory-judgment action in which plaintiff, Those Certain Underwriters at Lloyd's, London, Severally Subscribing to Policy Number MPL-0000343-01 ("plaintiff" or "Underwriters") seeks a declaration that it does not have a duty to provide coverage to Nick Karris Jr. ("Nick") under the professional-liability insurance policy (the "Policy") plaintiff issued to non-party Water Tower Realty Management ("WTRM") and other related named insureds, with respect to the claims asserted against Nick in an underlying state-court lawsuit pending in the Circuit Court of Cook County.

Some background is in order. On December 1, 2012, Nicholas A. Karris ("Nicholas"), a real-estate developer who owned WTRM, passed away suddenly, leaving a substantial estate that by 2016 was valued at approximately $300 million. He was survived by his wife, Mary Ann Karris ("Mary Ann"); his son, Nick; his daughter, Holly Sofia Karris ("Holly"); and four grandchildren. In 1997, Nicholas had executed an estate plan that included a Last Will and Testament and a Declaration of Trust (the "Trust"). Under the estate plan, Mary Ann would have a life estate in the income stream from the Trust for her reasonable support, with Nick and

Holly to equally share in the trust estate upon Mary Ann's passing, and should either Nick or Holly predecease Mary Ann, their individual 50% interest in the trust estate would pass to their child or children.

In 2019, the underlying state-court suit was brought by Holly, individually and as beneficiary and representative of the Trust, as well as her children and husband (collectively, "Holly"). Holly alleges that Nick and Mary Ann, along with KeyBank, the co-trustee of the Trust, engaged in an "unlawful, secret and fraudulent scheme to circumvent Nicholas'[s] unambiguous estate plan, defund the Trust and divert assets to the two dominant fiduciary family members and beneficiaries, Mary Ann and [Nick]." (ECF No. 1-2, *Karris v. KeyCorp* 1st Am. Compl. ("FAC") ¶ 4; ECF No. 35, Ex., *Karris v. KeyCorp* 2d Am. Compl. ¶ 4.) The specific claims Holly asserts against Nick are discussed in more detail below.

The Policy issued to WTRM and under which Nick seeks coverage for his defense in Holly's suit is a "claims made and reported" real estate and property managers' professional-liability policy, with a policy period from May 23, 2019 to May 23, 2020, and a retroactive date of May 23, 2014. It has limits of $2,000,000.00 per claim and $2,000,000.00 in the aggregate for the policy period.

Underwriters' complaint in the instant case contains eight counts. In Count I, plaintiff seeks a declaratory judgment that it has no duty to defend or indemnify Nick with regard to the claims in the underlying suit because the claims fall outside the insuring agreement. In Counts II through VIII, plaintiff alleges that there is no coverage due to policy exclusions for misappropriation (Count II); acts occurring prior to the policy's retroactive date (Count III); intentional acts (Count IV); claims based on breach of contract (Count V); claims by one insured against another (Count VI); claims of which the insured was aware prior to the policy period (Count VII); and claims to the extent that they seek certain excluded categories of damages (Count VIII). Nick counterclaimed for a declaratory judgment that Underwriters breached the Policy and must provide coverage in the underlying suit and that it is estopped from denying coverage, and he further seeks attorneys' fees and costs under 28 U.S.C. § 2202 and 215 ILCS 5/155.

Plaintiff moved for judgment on the pleadings on Counts I and II of the complaint under Federal Rule of Civil Procedure 12(c) and for dismissal of Nick's counterclaim. Nick cross-moved for judgment on the pleadings as to plaintiff's duty to defend, as to the entire complaint and the counterclaim. After the parties briefed their motions, the Second Amended Complaint in the underlying action was filed. Nick has amended his pleadings, motion, and briefs in the instant action to request identical relief with respect to the new complaint, but the parties agree that the Second Amended Complaint did not moot the instant action or substantively affect the coverage issues addressed in the parties' cross-motions.

## DISCUSSION

"When a Rule 12(c) motion is used in an attempt to dispose of the case on the merits, the Court applies the summary judgment standard, except that the Court may consider only the contents of the pleadings." *Nat'l Fire & Marine Ins. Co. v. 3327 W. 47th Place, LLC*, No. 16

CV 11590, 2017 WL 5499154, at *3 (N.D. Ill. Nov. 16, 2017) (citing *Alexander v. City of Chi.*, 994 F.2d 333, 336 (7th Cir. 1993)); *see also N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (pleadings that the court may consider include the complaint, the answer, and any written instruments attached as exhibits). The Court may also consider documents incorporated by reference into the pleadings and may take judicial notice of documents that are part of the public record, including documents from the underlying proceeding. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). In deciding each party's motion for judgment on the pleadings, the Court thus takes all well-pleaded allegations as true and draws all reasonable inferences in favor of the nonmovant. *3327 W. 47th Place*, 2017 WL 5499154, at *3. Judgment on the pleadings is appropriate where no reasonable jury could find for the nonmovant. *Hous. Auth. Risk Retention Grp., Inc. v. Chi. Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004); *N. Ind. Gun & Outdoor Shows*, 163 F.3d at 452.

"The interpretation of an insurance policy is a matter of state law." *Windridge of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, 932 F.3d 1035, 1039 (7th Cir. 2019) (internal quotation marks and citation omitted). The parties agree that Illinois law governs. Under Illinois law, the court construes an insurance policy and determines the parties' rights and obligations thereunder as a matter of law. *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 620 N.E.2d 1073, 1077 (Ill. 1993). The court's primary objective is to ascertain and give effect to the parties' intention, as expressed in the policy language. *Windridge*, 932 F.3d at 1039 (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). The court must construe the policy as a whole and consider the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Id.* (citing *Travelers Ins. Co. v. Eljer Mfg.*, 757 N.E.2d 481, 491 (Ill. 2001)).

An insurer must provide its insured with a defense when the allegations in the complaint are even potentially within the scope of the policy's coverage. *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 613 (7th Cir. 2010) (internal quotation marks and citation omitted) (citing Illinois law). "This is true even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 315 (Ill. 2006). "Both the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 269 (7th Cir. 2016), as amended (Jan. 25, 2017) (citing Illinois law). Because the duty to defend does not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action, the court "should not simply look to the particular legal theories pursued by the claimant, but must focus on the allegedly tortious conduct on which the lawsuit is based." *Medmarc*, 612 F.3d at 613 (citing *Hurst–Rosche Eng'rs, Inc. v. Com. Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995)); *see also State Farm Fire & Cas. Co. v. Young*, 968 N.E.2d 759, 763 (Ill. App. Ct. 2012) ("A court answers the question of whether a duty to defend exists by comparing the facts alleged in the underlying complaint to the language of the insurance policy.").

A. **Count I (Coverage)**

Plaintiff first contends that the Court should enter judgment on the pleadings in its favor because plaintiffs in the underlying suit do not seek damages against Nick for negligent acts in his professional services performed with respect to any property. Conversely, Nick contends that each of the claims against him in the underlying suit is predicated on such acts.

The Real Estate and Property Managers Professional Liability Coverage Part of the Underwriters Policy provides as follows in pertinent part, under the heading "What is covered":

> [Underwriters] will pay up to the **coverage part limit**[1] for **damages** and **claim expenses** in excess of the **retention** for covered **claims** against **you** alleging a negligent act, error, or omission in **your professional services** performed with respect to any property, whether or not owned by **you**, on or after the **retroactive date**, including but not limited to
>
> 1. failure to disclose;
> 2. negligent misstatement or negligent misrepresentation;
> 3. **third party discrimination**; or
> 4. **personal and advertising injury**,
>
> provided the **claim** is first made against **you** during the **policy period** and is reported to **us** in accordance with section V. (*Your obligations*).
>
> **Claims expenses** shall be part of and not in addition to the **coverage part limit**. Payment of **claims expenses** shall reduce and may exhaust the **coverage part limit.**

(ECF No. 1-1, Policy at 4.) "You, your, or insured" is defined in the Policy endorsements as a "named insured, additional insured, subsidiary, employee, independent contractor, or acquired entity, as defined in Section III. Who is an insured." (*Id.* at 24, 32.) An "insured" is defined in Section III of the Policy (including its endorsements) as a "**named insured**," "**additional insured**," "**employee**," or "**independent contractor**." (*Id.* at 4, 24, 32.) "Named insureds" include, in relevant part, Water Tower Realty Management (WTRM) and the Nicholas A. Karris 1997 Trust. (*Id.* at 1, 22.)

"Employee" is defined as "any past, present or future (1) person employed by the **named insured** as a permanent, part-time, seasonal, leased, or temporary employee, or any volunteer or (2) partner, director, officer, or board member (or equivalent position) of the **named insured**, but only while in the course of their performance of **professional services** on behalf of or at the

---

[1] Terms in boldface appear to be those that are specifically defined in the Policy.

4

direction of the **named insured**." (*Id.* at 10.)[2] By way of endorsement, the Policy defines "independent contractor" as "any person or entity contracted by the named insured or subsidiary to perform the same technology services as the named insured or subsidiary, but only while in the course of their performance of professional services on behalf of or at the direction of the named insured or subsidiary." (*Id.* at 32.)

By way of endorsement, the Policy defines "professional services" as "property management services and any other services identified as Covered Professional Services under the Real Estate and Property Managers Professional Liability Coverage Part section of the Declarations." (*Id.* at 25.) "Property management services," in turn, is defined as

1. development and implementation of management plans and budgets[;]
2. oversight of physical maintenance of property;
3. solicitation, evaluation, and securing of tenants, management of tenant relations, collection of rent, and processing evictions;
4. development, implementation, and management of loss control and risk management plans for real property;
5. development, procurement, implementation, and management of contracts and subcontracts necessary to the daily functioning of real property;
6. personnel administration and record keeping;
7. leasing services in connection with the property you are managing or
8. any other services identified as Covered Professional Services in the Declarations.

**Property management services** do not include the management or implementation of renovations or construction or reconstruction projects.

(*Id.* at 11.) The Policy does not identify any other services as "Covered Professional Services."

Thus, the first step in determining whether there is coverage is to examine whether the claims in the underlying suit are against an insured. Nick argues that there are two ways in which he qualifies as an insured: as an employee of WTRM and/or as an independent contractor of the Trust. (ECF No. 43, Def.'s Am. Combined Mem. Resp. & Supp. Mot. at 2-3.) Regarding the latter argument, Nick fails to discuss the Policy's definition of the term "independent

---

[2] Nick maintains that a different definition of the term "employee" applies—one that appears in the "General Terms & Conditions" supplement to the Policy and includes an "independent contractor" in the definition of "employee." But that supplement states not once, but twice, that where a definition in the applicable coverage part conflicts with that in the general terms and conditions, the definition in the applicable coverage part "shall prevail." (Policy at 13, 17.) The definition of "employee" in the Real Estate and Property Managers Professional Liability Coverage Part differs from and is more restrictive than that in the General Terms and Conditions. Thus, pursuant to the express terms of the Policy, the applicable definition of "employee" is that which appears in the Real Estate and Property Managers Professional Liability Coverage Part. (In any event, as discussed below, there is no indication that Nick meets the Policy's definition of "independent contractor.")

5

contractor" or develop any argument as to how he fits within the definition; therefore, he waives the argument. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (perfunctory and unsupported arguments are waived). It would be a nonstarter, in any event. There is no indication in the underlying complaint that Nick was contracted to perform any "technology services" whatsoever, as the Policy requires, let alone the same "technology services" as the Trust or other named insured.

The underlying complaint, however, does allege that Nick was "President" of WTRM. (FAC ¶ 247(e).) Thus, he would fall under the Policy's definition of an "employee" of a named insured, with an important caveat: "only while in the course of [his] performance of professional services on behalf of or at the direction of the named insured." (Policy at 10.) The coverage clause also restricts coverage to damages and claim expenses for claims "alleging a negligent act, error, or omission in the [insured's] professional services performed with respect to any property." (*Id*. at 4.) The next step, then, is to analyze whether the claims in the underlying suit allege a negligent act, error, or omission in Nick's professional services performed with respect to any property.

Holly's complaint in the underlying suit is lengthy; her basic allegations are as follows. Nicholas structured his estate plan with an awareness of "the toxic family dynamics that plagued the Karris family." (FAC ¶ 120.) The estate plan provided for an independent corporate trustee and reflects Nicholas's intent that "Mary Ann would be well taken care of but would have very little control or discretion over how his trust estate would be administered," so it does not authorize her to carry on his business, engage in the refinancing or sale of assets, make investment decisions or engage in transactions or agreements that would circumvent his estate plan, have individual control of his assets, or delay transferring title of residual estate assets to the trustees of the Trust. (*Id*. ¶¶ 46, 56-57, 60.) The Trust provides that the trustee would invest Nicholas's assets "to fulfill the material purpose of his estate plan to provide for his wife as a life estate holder entitled to distributions for her 'reasonable support' and to preserve [the] corpus for his children and grandchildren." (*Id*. ¶ 55.) It further provides that Mary Ann's right to remove a trustee could only be accomplished through the "simultaneous appointment" of a successor trustee, and any successor trustee would take title to the assets as of the date of the resignation of the last independent trustee. (*Id*. ¶ 56.) "Any distributions of either principal or income to Mary Ann could only occur in the independent Trustee's sole discretion" under the Trust. (*Id*. ¶ 57.)

Within two weeks of Nicholas's passing, Mary Ann sent Nicholas's attorneys an email "instructing them that she wanted them to implement a series of transactions that would directly circumvent the unambiguous directives" of Nicholas's estate plan. (*Id*. ¶ 100.) Holly believes that the email was written by Nick. (*Id*. ¶ 101.) The attorneys did not comply with the request. Nick and Mary Ann also tried to "force [Holly] to divide assets, and take other actions without the support of a supervising trustee that would protect her interests, or without appropriate professional representation." (*Id*. ¶ 82.) Nick and Mary Ann then "embarked on a scheme to divert trust assets and defund the Trust." (*Id*. ¶ 105.)

Nicholas had designated Mary Ann as the executor of his estate and a co-trustee of the Trust, and had designated as the independent trustee Ralph Picker, Nicholas's longtime accountant. Three months after Nicholas's passing, Mary Ann began proceedings in probate

6

court to have Picker removed as the independent trustee. This was the first step in Nick and Mary Ann's "scheme." (*Id.*) After a year of litigation, Picker resigned as trustee pursuant to a settlement agreement. Nick and Mary Ann began "shopping" for a corporate trustee that "would act in name only, as a bank and not a trustee, in exchange for significant trustee fees, and delegate all fiduciary functions to [Nick], including acts of discretion and judgment in his 'sole discretion.'" (*Id.* ¶ 106.) In September 2014, Mary Ann elected to appoint KeyBank as trustee. During the period of time between Picker's resignation and KeyBank's appointment, Nick and Mary Ann "attempted to transfer the largest asset out of the Trust, the limited partnership interests of WTCG [one of Nicholas's companies], worth anywhere from $90,000,000[.00] to $100,000,000[.00]," without notice to Holly, but that effort "was stopped by tax counsel." (*Id.* ¶ 85.) Another step in the scheme, then, says Holly, was to "terminat[e] the prior professionals that had been fair to all Karris family members and replace them with hostile and adverse legal representatives that sought to advance [Nick] and Mary Ann's interests, and circumvent" Nicholas's estate plan, and eliminate the estate plan's protections for Holly and her family. (*Id.* ¶ 107.)

After KeyBank's appointment, Holly's counsel contacted Key Bank to discuss Holly's belief that Mary Ann and Nick had been engaged in "ongoing efforts to circumvent the Trust [and] remove assets from the Trust," as well as prior "efforts to find a Chicago based trustee that would accept the appointment on the condition all trustee functions would be delegated to [Nick], with [Nick] retaining possession and control over trust assets and the cash accounts." (FAC ¶ 75.) A month later, Holly had discussions with KeyBank representatives in which she expressed her belief that "KeyBank had to do something immediately about Apple, Inc., whose lease was expiring" at premises on North Michigan Avenue in Chicago, for which Nicholas had owned a 100-year ground lease. (*Id.* ¶ 79.) Holly also told KeyBank that Nick did not have the expertise or education to manage these sophisticated negotiations, yet Nick and Mary Ann were refusing to hire competent brokers, and that there were other "problems" with Nick's management over the prior two years. (*Id.* ¶¶ 80-81.) According to Holly, Nick had refused to fund the Trust; took a "unilateral write down of his $4,200,000[.00] personal loan owed to the Estate . . . by $2,000,000[.00]"; used "a business line of credit in the amount of $500,000[.00] to fund personal purchases of real estate"; took compensation "far in excess of market and his historical compensation with financial reporting indicating another $100,000[.00] a month had been billed to the Estate for 'consulting fees' which remained unaccounted for"; used business credit cards to make personal purchases; retained employees "without legal status"; and made "other suspicious charges for business expenses not in line with historical operating expenses." (*Id.* ¶ 81.) When Holly raised these issues with Mary Ann, Mary Ann "bec[a]me enraged" and refused to address Holly's concerns, and when Holly raised them with Nick, he "began stonewalling Holly's ability to do her job as General Counsel and Commercial Property Manager,[3] and told management staff not to provide her any information about the businesses or his actions." (*Id.* ¶¶ 81, 83.) Holly also told KeyBank that Mary Ann and Nick had instructed professionals working for the Trust to "stonewall" her requests for information and access to Trust accounts and had failed to recognize her rights as a beneficiary; that Nick had replaced Nicholas's trusted advisors with people who were loyal to Nick and not Nicholas; that Nick had been trying unsuccessfully since 2004 to influence their father to alter his estate plan; and that

---

[3] Both Nick and Holly, evidently, worked for one or more of their father's companies.

7

KeyBank could not rely on Nick or Mary Ann's representations and had to retain independent professionals to represent the interests of the Trust and its beneficiaries in a fiduciary capacity. (*Id.* ¶ 86.)

Holly says that KeyBank representatives told her that KeyBank would administer Nicholas's Trust to comply with its express terms and the purpose and intent of his estate plan; honor its fiduciary obligations; protect her interests; act with transparency; take control of Trust assets for administration, including the Apple lease; move quickly to diversify the holdings of the Trust into a balanced portfolio; and engage in proper tax planning (which had not yet been undertaken). But that did not happen. Holly alleges that, unbeknown to her, KeyBank accepted the appointment as trustee "on the condition it would engage in a series of *ultra vires* acts intended to divert large sums of corpus to Mary Ann and [Nick] and defund the Trust, ignore the express provisions of the Will and Trust, and act in name only while allowing [Nick] to carry on Nicholas' businesses in his sole discretion, with [Nick] providing 'audited reports' from entirely unqualified professionals to KeyBank regarding his management of the assets." (*Id.* ¶ 117.)

Holly further alleges that Nick, Mary Ann, and KeyBank engaged in a scheme to "divert assets out of the Trust through a series of secret *ultra vires* and illegal transactions, and defund the Trust to benefit [Nick] and Mary Ann" and harm Holly's interests. (*Id.* ¶ 121.) It is alleged that the scheme encompassed several acts, including the following: transferring the limited partnership interests in WTCG to Mary Ann individually, allowing her to become the "owner" of the asset "empowered to create new grantor trusts, stripping any independent fiduciary control over that asset, while simultaneously eviscerating the Plaintiffs' intended inheritance"; delaying transferring title of Trust assets to KeyBank and funding the Trust, and placing sole control in Nick and Mary Ann to carry on Nicholas's businesses without any fiduciary oversight; providing Nick and Mary Ann in their "sole discretion" the power to make all discretionary decisions regarding the administration of trust assets, how revenue would be applied, how assets would be managed, and which professionals were employed to manage those assets; allowing Nick and Mary Ann to place tens of millions of dollars of unnecessary financing on the properties, sell property, and transferring the proceeds to themselves and not to the Trust, in amounts in excess of $50 million; providing "intentionally misleading, deceptive and incomplete financial 'reports' to conceal their fraudulent acts and true condition of the trust estate"; agreeing to make deceptive and false statements to Holly and her representatives; agreeing that KeyBank would not conduct independent analysis of or review Nick and Mary Ann's administration of Trust assets; engaging in meritless litigation and using Trust assets to attack Nicholas's testamentary intent; entering into illegal and *ultra vires* agreements to allow Nick to self-deal against the interests of the Trust and its beneficiaries; economically pressuring Holly by, *inter alia*, firing her from the management company and refusing to provide a distribution from the residuary trusts for her reasonable support; and diverting assets from and defunding the Trust, while "rewriting" the Trust to exculpate themselves from liability. (*Id.* ¶ 122.) These actions were "concealed through a byzantine network of LLCs, partnerships, and management companies, and worthless and intentionally deceptive financial 'reports.'" (*Id.* ¶ 124.)

Holly's complaint contains many other specific allegations that Nick and Mary Ann, along with KeyBank, engaged in "illegal and fraudulent conduct, and breaches of the Trust Agreement, and [] gross abuse of their fiduciary powers." (*Id.* ¶ 175.) But the Court will stop

there because it is unnecessary to delve further. The upshot is that Holly alleges that the defendants "converted and diverted" over $150,000,000.00 from the Trust, to her and her family's detriment. (*Id.* ¶ 171.)

In her original complaint in the underlying action, which is the relevant complaint, Holly asserted the following claims against Nick: breach of the Trust agreement, based on an "*ultra vires* distribution" to Mary Ann of the limited partnership interests in WTCG (Count I); fraudulent transfer of those interests (Count II); breach of the Trust agreement, based on dissipation of Trust assets through other *ultra vires* distributions (Count III); fraudulent transfer, based on those transactions (Count IV); conversion (Count VI); breach of the Trust agreement, based on the failure to provide an accounting of the Trust estate and access to Trust accounts (Count VIII); aiding and abetting, inducing, and participating in the fiduciaries' breaches of the Trust agreement and other fraudulent acts (Count IX); civil conspiracy to defraud (Count X); tortious interference with an inheritance expectancy (Count XI); intentional infliction of emotional distress (Count XII); and loss of consortium (Count XIII). (The remaining counts are not asserted against Nick.) Holly seeks various types of damages, including the "return of all improperly diverted and distributed amounts or assets, or their cash equivalent"; loss of value to the Trust; lost income, investment, and tax planning opportunities; prior litigation costs and fees paid by the Trust and Holly; professional fees incurred to implement illegal transactions; future litigation costs to restore the Trust; and professional fees for any necessary forensic accounting to restore the Trust, as well as punitive damages and attorneys' fees and costs. (*Id.* at 47.)

Nick argues that Holly's complaint "contains specific factual allegations of [his] alleged mismanagement of real property, . . . including the Apple Lease." (Def.'s Am. Combined Mem. Resp. & Supp. Mot. at 7.) He points to the allegations that he manages the assets of the Trust; that he did not have the expertise or education to manage the Apple negotiations; that Holly told KeyBank about the various "problems" with Nick's management; that he told staff not to provide her with information about the businesses or his actions; that Holly urged KeyBank to take control of the Apple negotiations because Nick did not have the competence or expertise to handle them; that the alleged scheme involved acts that Holly deems "ill-conceived," including her firing; that the Trust estate is worth less than it was at its outset despite a booming real estate market through 2016; and that the "true extent of the conversion, fraud, embezzlement and mismanagement" will only be revealed after a forensic accounting. Nick also points to Holly's request for the return of "management fees." (*Id.* at 8.)

According to Nick, these allegations constitute direct allegations of his negligence in providing "property management services" as defined in the Policy. The Court disagrees. "Although we focus on factual allegations above legal theories, factual allegations are only important insofar as they point to a theory of recovery." *Medmarc*, 612 F.3d at 613 (internal punctuation omitted); *see also Med. Protective Co. v. Fabricius*, No. 15 CV 6917, 2018 WL 2561009, at *3 (N.D. Ill. June 4, 2018) (the duty to defend is "not triggered by a free-standing reference to a fact not attached to any particular theory of recovery") (internal punctuation omitted). Many of the allegations on which Nick relies are general factual allegations and/or do not pertain to his alleged misconduct. A few of them do refer to his conduct, but none are based on negligence; rather, they are based on willful and intentional conduct—acts taken as part of an intentional scheme to circumvent Nicholas's estate plan, defraud Holly, and deprive her of her

inheritance.  The fact that the complaint contains tangential references to acts that could possibly imply negligence (Holly's allegation that she told KeyBank that there were various "problems" with Nick's management of the businesses and that Nick was in over his head with respect to the Apple lease, and her characterization of some of his actions as "ill-conceived") does not mean that her claims against Nick in the suit are based on negligence.  They are not.  Nor are Holly's claims based on negligent conduct with respect to any "professional services" Nick performed with respect to any property as an employee of WTRM.  For instance, Nick points out that Holly "complains about being terminated from WTRM," and argues that this allegation "falls directly within paragraph 6 of the definitions of 'property management services' as 'personnel administration.'"  (Def.'s Am. Combined Mem. Resp. & Supp. Mot. at 9.)  However, that is not conduct that is alleged to have been negligent.  Rather, it is alleged that as a part of the scheme, Nick intentionally fired Holly to "economically pressure" her.  (FAC ¶¶ 122q, 247o, 260.)

The Court has carefully reviewed the complaint in the underlying case.  The acts from which Nick's liability would arise stem from an alleged conspiracy to engage in fraud and self-dealing.  His conduct is alleged to have been willful and intentional.  There simply is no reasonable reading of the underlying complaint that implicates negligent conduct on Nick's part for which recovery is sought.  Accordingly, plaintiff has no duty to defend Nick in connection with the underlying action.  *See Crum & Forster*, 620 N.E.2d at 1079 (finding no duty to defend under a real estate agents' professional liability policy where in the underlying action defendants were alleged to have engaged in tortious conduct and unfair business practices, reasoning that "although the complaint contains allegations which refer to real estate matters such as listings and commissions," those allegations did not "form the genesis of" the claims, and that the claims were not made because the insureds "somehow incorrectly performed real estate services," but rather because they allegedly engaged in tortious conduct and unfair business practices); *Am. Nat'l Fire Ins. Co. v. Abrams*, No. 99 C 5807, 2002 WL 243455, at *6 (N.D. Ill. Feb. 19, 2002) (applying Illinois law and finding no duty to defend under a lawyers' professional liability policy where in the underlying action the defendant lawyers were alleged to have engaged in fraud and RICO violations by engaging in a "sudden stop accidents" scheme); *State Farm Fire & Cas. Co. v. Martin*, 710 N.E.2d 1228, 1233 (Ill. 1999) (finding that even where the complaint in the underlying suit included allegations of negligence, the defendant's alleged misconduct of hiring someone to commit arson was intentional and willful, and thus fell within the insurance policy's exclusion for bodily injury that was the result of willful and malicious acts); *see also Conn. Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 351 (7th Cir. 2003) (applying Illinois law) ("Phrases such as 'mislead and conceal,' 'scheme or device,' and 'intentionally and willfully' are the paradigm of intentional conduct and the antithesis of negligent actions.").

This result comports with the kind of insurance that was purchased here and the overall purpose of the policy.  The coverage part at issue is titled "Real Estate and Property Managers Professional Liability."  By its plain language, it is intended to cover damages for an insured's negligent acts in providing professional services with respect to property.  As plaintiff correctly points out, the Policy was clearly not intended to cover alleged intentional and tortious conduct by an individual who is alleged to have participated in a scheme to divert trust assets from a family member for his own benefit.  *See Crum & Forster*, 620 N.E.2d at 1079 ("[T]o construe these error-and-omissions policies to cover the claims [for tortious conduct and unfair business practices], as the insureds urge us to do, would expand the coverage beyond what was contracted

10

for by the parties. The insureds' interpretation of these policies could not have been reasonably contemplated by the parties when they entered into these insurance contracts.").

Because plaintiff has no duty to defend Nick in the underlying action, it has no duty to indemnify, either. *See id.* at 1081 ("[W]here there is no duty to defend, there will be no duty to indemnify . . . .").

**B.      Count II (Misappropriation Exclusion)**

Plaintiff is also entitled to judgment on the pleadings on Count II, in which it seeks a declaratory judgment that it has no duty to defend or indemnify Nick due to the "misappropriation of funds" exclusion of the Policy. That exclusion provides that plaintiff has no duty to pay any sums under the Real Estate and Property Managers Professional Liability Coverage Part for any claim "that is based on or arises out of the actual or alleged theft, misappropriation, commingling, or conversion of, or failure to safeguard, any funds, moneys, assets, or property." (Policy at 6, 8.)

The Court agrees with plaintiff that the claims in the underlying action arise out of Nick's alleged theft, misappropriation, and/or conversion of funds, assets, and property of the Trust and are therefore excluded from coverage under the plain language of the Policy. Nick's sole argument regarding the misappropriation exclusion is that Holly's complaint "alleges facts of negligence" and seeks damages that "flow from" negligence, and therefore not all of the claims are based on theft or misappropriation. (Def.'s Am. Combined Mem. Resp. & Supp. Mot. at 14.) As discussed above, this argument is rejected.

**C.      Counts III-VIII**

Because the Court will enter judgment on the pleadings in plaintiff's favor on Counts I and II of the complaint, it is unnecessary to reach Nick's cross-motion for judgment on the pleadings with respect to plaintiff's remaining claims in Counts III-VIII of the complaint, which are all premised on policy exclusions. Moreover, Nick presents only conclusory, undeveloped arguments on these claims. The arguments appear in his motion, not in his supporting memorandum of law, and contain no analysis, application of law to the facts, or citations to authority. Even if the Court had found it necessary to discuss those claims, Nick waived argument on them for purposes of his cross-motion. *See Crespo*, 824 F.3d at 674.

**CONCLUSION**

Plaintiff's motion for judgment on the pleadings [22] is granted. Defendant Nick Karris Jr.'s amended cross-motion for judgment on the pleadings [42] is denied. Defendant Nick Karris Jr.'s cross-motion for judgment on the pleadings [24] is terminated as superseded by the amended cross-motion. Judgment is entered in favor of plaintiff and against Nick Karris Jr. on Counts I and II of the complaint and on the counterclaim. Plaintiff is directed to file a statement no later than February 17, 2021 indicating its intent with respect to the remaining counts of the complaint.

**DATE:** February 10, 2021

                                                   _____
                                                   **Hon. Ronald A. Guzmán**
                                                   **United States District Judge**